UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                 NO. 08-20314

v.

                                 HON. NANCY G. EDMUNDS

ISSAM HAMAMA,

       Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this sentencing memorandum to inform the Court of its position at sentencing. Based on the sentencing guidelines and the other factors listed in 18 U.S.C. § 3553(a), the government requests a sentence of 78 months in this case.

## BACKGROUND

The following is a summary of the facts established at trial and which were provided by the government for inclusion in the Presentence Report.

During the reign of Saddam Hussein, the Iraqi government established and maintained a foreign intelligence service, known as the Iraqi Intelligence Service ("IIS"). After the fall of Saddam Hussein in 2003, United States military forces

operating in Baghdad, Iraq, captured documents belonging to the IIS.  The
government introduced at trial a number of IIS documents that pertained to the
defendant.  According to these documents, the defendant began working for the IIS
in 1992 to "follow-up on hostile activity in America."  Gov. Ex. 1.39A.  The
documents further revealed that the IIS "appointed" the defendant to a special
mission.  Gov. Ex. 1.23A.  The purpose of this mission was to lure to Iraq
members of the Bet Narain party, a political party located in the United States that
was opposed to Saddam Hussein.  Once inside Iraq, the IIS planned to get "closer"
to members of the opposition party "in order to infiltrate and use them against
others."  Gov. Ex. 1.17A.  The IIS intended to accomplish its plan by "precisely
monitoring them [the opposition members]," "finding their family roots [in Iraq],"
and making "frequent contacts" with the group while they were in Iraq "to
approach them again to serve our work."  Gov. Ex. 1.36A.  This mission was so
significant to the Iraqi regime that the Office of the President, Saddam Hussein,
sent a correspondence to the IIS approving the plan.  Gov. Ex. 1.17A.

   The defendant voluntarily joined this plan.  He sent a letter to the chief IIS
officer at Iraq's Mission to the United Nations in New York, New York.  In that
letter, the defendant described himself as the publisher of a magazine that was "an
informational platform, an ideological weapon and a political machine," and "a

2

tongue for the government" of Saddam Hussein.  The defendant stated that his magazine "works to silence" opposition groups and "confront and stone the opposing powers."  The defendant offered to assist the Iraqi government penetrate opposition groups in order to "weaken the size and influence and activity of the betraying and dissenting Iraqi forces."  Gov. Ex. 1.3A.

To accomplish this plan, the defendant met with members of the Bet Nahrain Party.  According to Shimon Khamo, a member of the party who testified at trial, the defendant encouraged the party and assisted its members in writing to the Iraqi regime about traveling to Iraq.  Khamo testified that the members of the Bet Nahrain Party ultimately refused to travel to Iraq because they did not trust Saddam Hussein and were concerned for their safety.

At approximately the same time that the defendant was participating in the IIS plan to lure members of the Bet Nahrain Party back to Iraq, he also served as the master of ceremonies at a party at the Iraqi Interests Section in Washington, D.C. to celebrate the anniversary of Saddam Hussein's rise to power.  According to a video recording of the party, which was introduced as an exhibit at trial, the defendant praised "our great party, the great national Baath party led by the champion of the Arab world, our fighting commander, Saddam Hussein."  The defendant further stated, "[i]n this occasion, we express our loyalty to him while he

3

is leading the great Iraq to the other side." Gov. Ex. 3A.

In addition, the captured IIS documents show that the defendant sent reports to the IIS using a post office box in Alexandria, Virginia. From 1998 through 2001, the defendant was also paid several hundred dollars by the IIS. These payments included a $250 money order that was paid to the defendant in 2001. IIS documents show that the payment was made as "aide to Code 6129." Gov. Ex. 1.44A. Documents from the defendant's Comerica bank account confirm that the defendant deposited the money order into his checking account. Gov. Ex. 1.44 to 1.47. Other payments included a $210 payment in July 1998 and a $147 payment in June 1998. According to IIS payment vouchers, both of these payments were for "work purposes." Gov. Ex. 1.51A and 1.52A. The translations of these payment vouchers are attached to this sentencing memorandum as Exhibit A.

In 2003, the defendant applied to become a translator for United States military forces stationed in Iraq. To obtain this position, the defendant completed an application for a security clearance. On this application, the defendant was asked if he "ever had any contact with a foreign government, its establishments (embassies or consulates), or its representatives, whether inside or outside of the U.S., other than on official U.S. Government business." The defendant answered "no." Gov. Ex. 19. In addition to the IIS documents, video recording, and banking

4

records described above, the defendant's answer was false because telephone

records introduced at trial established that during 1996 and 1998, the defendant

made 198 telephone calls to the Iraqi embassy in Washington, D.C., the Iraqi

Mission to the United Nations, and Iraqi government officials who were IIS

officers.  Gov. Ex. 16.  The summary of these telephone records are attached to this

sentencing memorandum as Exhibit B.  Many of the defendant's telephone calls to

the IIS officers were made to their home and cellular telephone numbers around

midnight and lasted10 to 15 minutes in duration.  In addition, an address book

found in the defendant's home when he was arrested in 2008 contained the names

and telephone numbers of numerous Iraqi government officials, including IIS

officers (some of whom the defendant had extension telephone contact with).  Gov.

Ex. 6A.  As a result of the defendant's fraudulent security clearance application, he

was awarded a "Secret" security clearance and was permitted to work with U.S.

soldiers stationed in a combat zone in Iraq.  As part of his duties, the defendant was

given access to classified military information.  The defendant was employed in

this capacity until November, 2003.

In 2005, the defendant again applied to become a translator for United States

military forces stationed in Iraq.  He again completed an application for a security

clearance.  He again answered "no" to the question about his contacts with a

foreign government.  Gov. Ex. 20A.  As the result of the defendant's fraudulent

security clearance application, he was awarded a "Secret" security clearance and

was permitted to work with U.S. soldiers stationed in a combat zone in Iraq.  As

part of his duties, the defendant was given access to classified military information.

The defendant was employed in this capacity until May, 2006.  When the

defendant returned to the United States from Iraq in 2006, U.S. Customs and

Border Protection officers examined the contents of the defendant's baggage.

Among the items found was a notebook that contained sensitive military

information that the defendant gathered during his time as a translator.  Gov. Ex. 5.

Witnesses who testified at trial -- some of whom were the defendant's own

witnesses -- acknowledged that this information should not have left Iraq because

of its sensitive nature.

A few days after entering the United States, the defendant was interviewed

by FBI Special Agents Thomas Lee Rankin about the notebook.  Transcript of

Trial Testimony of FBI Special Agent Thomas Rankin, January 10, 2011, at 23-24.

The defendant told Agent Rankin that he destroyed the notebook once he returned

to the United States because the notebook had fallen in water.  *Id.*  The CBP officer

who examined the notebook upon the defendant's entry into the United States

testified that it was not wet.

6

Agent Rankin also asked the defendant about the letter he had written to the IIS pledging to assist the Iraqi regime in penetrating opposition groups. *Id.* at 21-22. The defendant stated he dictated the letter, but denied delivering it. *Id.* A few days later, Agent Rankin interviewed the defendant again and showed him a copy of his letter. *Id.* at 25. The defendant claimed he wrote the letter to "play with the regime." *Id.* at 27. The defendant also admitted that Iraqi government officials would ask him questions about opposition groups and give him the names of opposition leaders that were of interest. *Id.* at 28. In turn, the defendant would report on those opposition groups. The defendant further admitted to reporting on individuals who were active in Dearborn, Michigan. *Id.* at 30. The defendant told Agent Rankin that he now believed what he did was wrong. *Id.* However, the defendant denied ever receiving money from the IIS. *Id.*

In 2008 -- after having been interviewed on multiple occasions by the FBI about his contacts with the IIS -- the defendant again applied to become a translator for United States military forces stationed in Iraq. He again completed an application for a security clearance. Gov. Ex. 21A. The defendant again answered "no" to the question about his contacts with a foreign government. *Id.*

On January 14, 2011, a jury found the defendant guilty of Counts Two through Four of the superseding indictment, which charged making false

statements, in violation of Title 18, United States Code, Section 1001.  With respect to Count Two, the jury found that the defendant falsely stated on his 2003 security clearance application that he did not have any contact with a foreign government.  In Count Three, the jury found that the defendant falsely stated on his 2005 security clearance application that he did not have any contact with a foreign government. In Count Four, the jury made two separate findings.  First, the jury found that the defendant falsely stated to an FBI agent in 2006 "that he did not have a source relationship with the Iraqi Intelligence Service."  Second, the jury found that the defendant falsely stated to an FBI agent in 2006 "that he did not receive compensation from the Iraqi government."  *See* Exhibit A, Verdict Form, Docket No. 64.

<u>ARGUMENT</u>

Under 18 U.S.C. § 3553(a)(2), a court must impose a sentence "sufficient, but not greater than necessary, to comply" with the following purposes: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In fashioning such a sentence, a court shall consider, among the other factors set forth in Section 3553(a), "the nature and circumstances of the offense," "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the need for adequate deterrence, and the applicable guidelines set forth by the Sentencing Commission.  18 U.S.C. § 3553(a)(4).

A.    The Sentencing Guidelines

Although the Sentencing Guidelines are no longer mandatory after *United States v. Booker*, 543 U.S. 220 (2005), "[o]ne of the sentencing factors that the district court must consider is the applicable Guideline range."  *United States v. Thompson*, 515 F.3d 556, 560 (6th Cir. 2008).  The revised Presentence Report calculated a guideline range of 78 to 97 months, based on a base offense level of 28 and a criminal history category I.  The government believes that the Presentence Report's calculations are correct for the following reasons.

(1)    The Presentence Report Properly Applied Guideline §2M5.1(a)(1) Because the Jury Found That the Defendant Engaged in Financial Transactions With Iraq, a Country That Supported International Terrorism

The defendant was convicted of three counts of making false statements in violation of 18 U.S.C. § 1001.  The Presentence Report correctly applied Guideline §2B1.1.  This guideline is most commonly used in cases involving theft or fraud.

9

As a consequence, the guideline starts with a base offense level of 6 or 7, which is then adjusted upward based on the dollar amount of the loss involved or other factors. Obviously, determining a sentence in the present case using loss amounts does not make sense. Recognizing this reality, the cross reference at §2B1.1(c)(3) states:

> If (A) neither subdivision (1) [involving firearms] nor (2) [involving arson] of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., 18 U.S.C. § 1001 . . . ); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two, apply that guideline.

This cross reference exists because "[s]ometimes, offenses involving fraudulent statements are prosecuted under 18 U.S.C. § 1001, or a similarly general statute, although the offense involves fraudulent conduct that is also covered by a more specific statute." §2B1.1, application note 15. An example given by the Sentencing Commission includes a defendant who is convicted of making false statements to a customs officer, but is sentenced under §2T3.1, which involves evading import duties and smuggling because this guideline "likely would be more apt." *Id.*

In the present case, the jury convicted the defendant of Count Four, which charged making two different false statements to an FBI agent. In convicting the

10

defendant of Count Four, the jury expressly found that the defendant falsely told the FBI agent "that he did not receive compensation from the Iraqi government . . . ."  Exhibit C, Verdict Form, Docket No. 64.  Evidence at trial established that this compensation was in the form of various monetary payments and benefits given to the defendant by the IIS from 1998 to 2001.  *See* Transcript of Trial Testimony of FBI Special Agent Thomas Rankin, January 10, 2011, at 42-46.  These payments included, among other things, a $250 money order that was paid to the defendant by the IIS in 2001 and deposited into the defendant's personal checking account.  *Id.*

The jury's findings with respect to Court Four, along with the evidence presented at trial, conclusively establish that the defendant engaged in financial transactions with the government of Iraq, which at the time was under a complete embargo by the United States that prohibited nearly all trade between the United States and Iraq.  In addition, the defendant acknowledged upon cross-examination that he was familiar with the U.S. embargo on Iraq at the time of his dealings with the IIS.  *See* Transcript of Trial Testimony of Issam Hamama, January 11, 2011, at 60.

When the defendant was receiving payments from the IIS, it was a criminal offense for a U.S. person to engage in financial transactions with the government

of Iraq.  *See* 50 U.S.C. §§ 1701-1705; 31 C.F.R. § 575.201.  The jury's findings

and evidence presented at trial therefore set forth conduct that "establishes an

offense specifically covered by another guideline," namely, §2M5.1 which is

entitled "Evasion of Export Controls; Financial Transactions with Countries

Supporting International Terrorism."  This guideline contains a base offense level

of 26 if "the offense involved a financial transaction with a country supporting

international terrorism."   §2M5.1(a)(1).  According to the guideline's application

notes, "'a country supporting international terrorism' means a country designated

under section 6(j) of the Export Administration Act . . . ."  *Id.* at App. Note 4.  It is

beyond dispute that Iraq was so designated.  *See* 55 Fed. Reg. 37793-01 (Sept. 13,

1990).

Because the jury's findings and the evidence at trial established that the

defendant committed an offense covered by a more apt guideline, the Presentence

Report was correct in applying §2M5.1 and thereby scoring the defendant's base

offense level at 26.

> (2)   The Presentence Report Properly Adjusted the Defendant's
>        Base Offense Level Under §3C1.1 Because the Defendant
>        Obstructed Justice

The Presentence Report increased the defendant's base offense level two

levels pursuant to Guideline §3C1.1 because the defendant obstructed justice.

Guideline §3C1.1 provides for the increase to a defendant's base offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede," the investigation of the instant offense of conviction. The defendant's obstruction must also relate to the offense of conviction, relevant conduct, or a closely related offense. The defendant deserves the two level adjustment pursuant to §3C1.1 for two reasons.

> (a)    The Defendant Made False Statements, Under Oath, to a Federal Investigator

At trial, the government called as a witness Brenda Hall, an investigator with the Office of Personnel Management. Mrs. Hall testified that in 2008 the defendant applied (for a third time) for a security clearance. FBI Special Agent Thomas Rankin testified that the FBI's investigation of the defendant began in 2005. Agent Rankin also testified that at the time of Mrs. Hall's interview of the defendant, the FBI had interviewed the defendant on multiple occasions regarding his contacts with the IIS. During those interviews with the FBI, the defendant lied about his relationship with the IIS, which formed the basis for his conviction on Count Four.

As part of the defendant's security clearance background investigation, Mrs. Hall interviewed the defendant under oath. Mrs. Hall was unaware of the FBI's

criminal investigation of the defendant.  During the interview with Mrs. Hall, the

defendant stated that he had been interviewed by the FBI about his "hobbies,"

namely his magazine and other media interests.  The defendant did not tell Mrs.

Hall the true nature of the FBI's interview, nor did he tell Mrs. Hall about his

contacts with the Iraqi government or the IIS.

The defendant also made false statements on his 2008 security clearance

application.  *See* Gov. Ex. 21A.  On that application, the defendant falsely stated

that he did not have any contacts with a foreign government.  It was this

application that prompted Mrs. Hall to conduct her interview of the defendant.

By lying on his 2008 security clearance application, and by lying under oath

to Mrs. Hall, the defendant was attempting to prevent the government from

learning about his activities on behalf of the IIS.  He made these lies at a time when

he knew he was under investigation by the FBI for his contacts with the IIS.

Moreover, these lies were material because they went to the heart of the

government's investigation of the defendant.

(b)    The Defendant Committed Perjury at Trial

An adjustment for obstruction of justice is warranted for "committing,

suborning, or attempting to suborn perjury . . . ."  §3C1.1, App. Note 4(B).  "For a

district court to impose an obstruction-of-justice enhancement to a defendant's

sentence under § 3C1.1 of the Sentencing Guidelines, the court must 1) identify

those particular portions of defendant's testimony that it considers to be perjurious;

and 2) either make a specific finding for each element of perjury or, at least, make

a finding that encompasses all of the factual predicates for a finding of perjury."

*United States v. Boring*, 557 F.3d 707, 712 (6th Cir. 2009).  The elements of

perjury are "false testimony concerning a material matter with the willful intent to

provide false testimony, rather than as a result of confusion, mistake, or faulty

memory."  *United States v. Dunnigan,* 507 U.S. 87, 94 (1993).

The defendant's perjury at trial was extensive and covered a variety of

material topics, including:

- The defendant testified that when he answered "no" to the
  question on his 2003 and 2005 security clearance application
  about his contacts with a "foreign government, its
  establishments (embassies or consulates), or its representatives"
  he thought he was answering truthfully because Iraq was not a
  foreign country to him.  Transcript of Trial Testimony of Issam
  Hamama, January 11, 2011, at 38-39.   This testimony was
  rejected by the jury and refuted by the fact that, on the same
  security clearance applications, the defendant listed Iraq when
  asked to describe "foreign travel" and "foreign military
  service."  *Id.* at 84-85.

- The defendant claimed that his telephone conversations with IIS
  officers consisted of conversations about "the weather, the
  magazine, how he [the IIS officer] is doing, you know," and
  that his faxes to the Iraqi government were only part of his
  efforts to get travel documents for other people.  *Id.* at 28.  This

15

testimony was contradicted by telephone records that showed the defendant's placed almost 200 calls to Iraqi government offices or IIS officers -- many of which were made during the middle of the night and lasted 10-15 minutes.  These conversations were also frequent -- sometimes within a few days of one another.  *Id.* at 72-74.  Moreover, the dates of the IIS documents detailing the defendant's activities corresponded to the dates of the defendant's telephone calls with the IIS.  *Id.* at 71-72.

- The defendant testified that "I didn't receive any compensation from the Iraqi government whatsoever, even the $250."  *Id.* at 24-25.   This testimony was specifically rejected by the jury when they convicted the defendant of Count Four.  It was also contradicted by IIS documents which showed that the defendant received payments -- including a $250 money order -- as "aide to code 6129."  Gov. Ex. 1.44A.  Other IIS documents show the defendant receiving additional payments as "a gift for work purposes."  Gov. Ex. 1.51A and 1.52A.

- The defendant testified that he never "worked as a source for the Iraqi government," and that he never "deliberately lie[d] on any formal document that [he] submitted to the government." Trial Testimony of Issam Hamama, January 11, 2011, at 52-53. These statements were contradicted by the government's evidence at trial and the jury rejected both of these lies by convicting him of Count Four.

In short, this is not a situation where a defendant's false testimony was the result of confusion or mistake.  *Dunnigan,* 507 U.S. at 95.  Rather, the defendant's perjury was so frequent and covered so many different subjects that his conduct was a willful attempt to obstruct the truth finding function of the jury.  "The right

16

to testify at trial . . . does not include a right to commit perjury." *United States v. Burnette,* 981 F.2d 874, 879 (6th Cir.1992).  Defendants who commit perjury on such an extensive scale as this defendant deserve increased punishment.  The two level adjustment under §3C1.1 should be applied.

      B.    <u>The Nature and Circumstances of the Offense</u>

The defendant's conduct in this case presents two different, but related harms.

      (1)    The Defendant Reported to the IIS on Individuals and Groups in the United States That Were Opposed to Saddam Hussein

The defendant acted as an intelligence source for a foreign government that was both hostile to the United States and keenly interested in the activities of individuals in the United States who were opposed to the regime of Saddam Hussein.  The defendant's activities on behalf of the IIS took two forms.  The first type of activity the defendant conducted for the IIS was the collection of information about individuals and groups opposed to Saddam Hussein.  Agent Rankin testified at trial that the defendant admitted the following during an interview:

> He [the defendant] said he would send them [IIS officials] copies of his magazine periodically, and then he would send them articles on -- from both San Diego and Detroit concerning Iraqi opposition groups. He said that he was asked to follow up on opposition leaders and send

reports to them.  He commented that he would be provided with the names of the groups, he would research them and then send them back to Fadhil [an IIS officer].

Transcript of Trial Testimony of FBI Special Agent Thomas Rankin, January 10, 2011, at 28.  Agent Rankin also testified that the defendant stated "Fadhil was interested in a Shi'ite group in Dearborn, Michigan that he [the defendant] provided information to Fadhil about."  *Id.* at 30.

The second type of activity the defendant performed for the IIS was his active participation in an IIS plan to lure Shimon Khamo and other members of the Bet Narain party back to Iraq so that the party could be penetrated by the IIS.  IIS documents introduced at trial showed that the IIS intended to accomplish this by "precisely monitoring them [the opposition members]," "finding their family roots [in Iraq]," and making "frequent contacts" with the group while they were in Iraq "to approach them again to serve our work."  Gov. Ex. 1.36A.  The defendant's participation in this IIS plan demonstrates the willingness of the defendant to engage in conduct on behalf of the IIS that had the very real potential of endangering the lives and safety of U.S. persons and their relatives.

The defendant will undoubtedly claim that this Court should not consider his activities on behalf of the IIS because the jury acquitted him of Count One of the indictment, which charged a conspiracy to act as an agent of the IIS.  The

defendant is wrong as a matter of both fact and law.  It is well settled in the Sixth Circuit that a "district court's consideration of acquitted conduct in sentencing passes constitutional muster."  *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc).  Moreover, the jury convicted the defendant in Count Four of falsely stating to an FBI that "he did not have a source relationship with the Iraqi Intelligence Service."  Exhibit C, Verdict Form, Docket No. 64.  This means that the jury must necessarily have found that the defendant was in fact a knowing source of the IIS.

This Court should take into consideration in sentencing the defendant's activities on behalf of the IIS and the danger that his activities presented to individuals who were opposed to the regime of Saddam Hussein.

(2)     The Defendant Hid His Source Relationship with IIS to Obtain a Security Clearance and Work With U.S. Troops in a Combat Zone

The second harm caused by the defendant's conduct is that, by lying about his source relationship with the IIS, the defendant was able to obtain employment as a contractor to work with U.S. troops in a combat zone in Iraq.  The defendant also lied about his source relationship with the IIS to obtain "Secret" level security clearances.  As a result of obtaining those security clearances, the defendant was given access to classified U.S. military information.

19

Also troubling is the fact that the defendant submitted security clearance applications that contained false information about his contact with the IIS on multiple occasions: one in 2003, one in 2005, and one in 2008.  The defendant's deceptive conduct was not simply a one-time incident.  It was an ongoing pattern of conduct.

Even more disturbing is that the evidence at trial raised serious questions about the defendant's handling of the sensitive information that he was entrusted with.  The notebook that the defendant brought back to the United States from Iraq in 2006 contained sensitive information about individuals who were transporting ammunition and explosives for the insurgency in Iraq, and information about the identities of individuals who were buying and planting bombs in Iraq.  On cross-examination, the government confronted the defendant with this information and the defendant himself admitted that his notebook contained sensitive information.[1] Even one of the defendant's own witnesses acknowledged that the information the defendant had in his notebooks was sensitive and should not have been taken out

---

[1]  The government asked "Sir, isn't it true that in your notebook that you brought back from a combat theater in Iraq had sensitive information in it like about who was planting bombs? Isn't that true?"  The defendant answered "It is true, sir."  Transcript of Trial Testimony of Issam Hamama, January 11, 2011, at 91.

of Iraq.[2]

At the time the defendant was in Iraq with U.S. troops, coalition forces were fighting a deadly insurgency that included members of the former regime of Saddam Hussein -- the same government that the defendant covertly served just a few years before.[3]  The defendant's position of trust with the U.S. military forces in Iraq created a situation where the defendant himself could assist the insurgents, or could be coerced by the insurgents into assisting.  There is, of course, no evidence that this actually happened.  But whether it did or did not happen misses the point. The defendant's mere presence with U.S. troops was an ongoing danger -- a danger that the government was not aware of because of the defendant's repeated lies. The defendant should be punished for creating that danger, for allowing it to persist for so long, and for attempting to hide it even after the FBI began its investigation of him.

  C. <u>The History and Characteristics of the Defendant</u>

---

[2]  During cross-examination, Ronald Coleman was shown the information from the defendant's notebook and asked "All right. So that type of information was not supposed to be removed by people who worked in Iraq outside of Iraq, right? That was supposed to stay in Iraq?"  The witness answered: "Yes, ma'am." Transcript of Trial Testimony of Ronald Coleman, January 12, 2011, at 26.

[3]  The defendant's own witness, James Oliver, explained to the jury that the insurgency in Iraq was "composed of different groups," and included "Ba'athist, ex-Ba'athist, ex-Saddam Ba'ath Party members that want to see the Americans evicted from Iraq . . . ."  Transcript of Trial Testimony of James Oliver, January 12, 2011, at 36-37.

The defendant has attached letters and certificates of appreciation from members of the U.S. military.  The defendant claims that he should receive a lenient sentence because he is a patriotic person who assisted U.S. military forces in Iraq.  The defendant relies mainly on letters from retired Lt. Col. James Oliver, Army Chaplin Lt. Col. James Chapin, and Captain John Kimbrough.  Oliver and Chapin testified at trial, as did Sergeant Major Ronald Coleman, who apparently did not write a letter on behalf of the defendant for sentencing.

This Court should place little or no value on these letters or the testimony of these individuals.  The testimony of Chapin, Coleman and Oliver is of limited value because all three witnesses were impeached at trial.  All of these witnesses admitted that they did not know any details about the case; they had not seen the exhibits or evidence in the case.  Coleman even admitted on the stand that "I really didn't know what was a hundred percent anything that was going on until I got here," and "I've heard rumors, but I didn't know anything," and "I'm kind of in the dark, still in the dark a little bit."  Transcript of Trial Testimony of Ronald Coleman, January 12, 2011, at 27.  And when asked if he agreed with the statement that "sometimes you don't know everything about your friends," Coleman responded "That's right, yes ma'am.  I agree."  *Id.* at 29.

The cross-examination of Chapin revealed him to be a less than fully honest

22

witness.  Following his testimony on direct examination that the defendant had a

reputation in the military community for truthfulness and loyalty to the United

States, Chapin admitted the following:

| | |
|---|---|
| CORKEN: | Mr. Faraj asked you a couple questions about Mr. Hamama's reputation, and he specifically asked you about Hamama's reputation for truthfulness.  Do you recall that question, sir? |
| CHAPIN: | Yes, I do. |
| CORKEN: | How many people have you spoken with about Mr. Hamama's truthfulness? |
| CHAPIN: | Outside of the battalion commander and command sergeant major and some of the first sergeants, probably five to six people is all, and that was pretty much while we were overseas. |
| CORKEN: | And the topic of conversation with those five or six people was Mr. Hamama's truthfulness? |
| CHAPIN: | Not necessarily. |
| CORKEN: | Okay.  That was my question, sir. |
| CHAPIN: | Okay. |
| CORKEN: | How many people have you spoken with, specifically, about Mr. Hamama's truthfulness? |
| CHAPIN: | Okay.  None. |
| CORKEN: | And, sir, how many people have you spoken with specifically about Mr. Hamama's loyalty? |
| CHAPIN: | I guess in honesty, really, none. |

Transcript of Trial Testimony of James Chapin, January 11, 2011, at 15-16.

Oliver's testimony was particularly lacking in credibility given his

combative demeanor on cross-examination and the following exchange, in which

Oliver, once he was able to see how the government was impeaching him, changed

his testimony and claimed that he could not remember a conversation he had with

Chapin outside the courtroom less than 24 hours before Oliver's testimony:

> CORKEN: Sir, you were in the courthouse yesterday?
> OLIVER: Yes.
> CORKEN: And you were in the hall outside this courtroom at about 1:00?
> OLIVER: Yes.
> CORKEN: And at that time, you had a conversation with Lieutenant Colonel James Chapin?
> OLIVER: Yes.
> CORKEN: And Mr. Chapin, or Lieutenant Colonel Chapin – excuse me -- told you the questions that he had been asked by me, did he not?
> OLIVER: I believe he did.
> CORKEN: Okay. So you have kind of had a preview of what I might ask you on your cross examination, correct?
> OLIVER: I don't recall what he told me.
> CORKEN: Okay. You have forgotten what he said to you yesterday?
> OLIVER: Yes, I don't recall what he said.

Transcript of Trial Testimony of James Oliver, January 12, 2011, at 45.

The testimony of Chapin, Coleman and Oliver is further undermined by the

fact that the government has identified other members of the U.S. military who

served in Iraq with the defendant and who have an unfavorable view of his work.

One of these individuals, Captain Jan Stewart, worked with the defendant in 2005

and testified that he did not trust the defendant.  The defendant did not provide

U.S. soldiers with complete and full translations.  Stewart stated that the defendant

24

asked questions about the plans and activities of the U.S. military that were not

pertinent to his duties.  Captain Stewart's concerns were shared by Captain Brian

Covert, who also worked with the defendant closely at this time.  *See* Exhibit D,

302s of Jan Stewart and Brian Covert.

The defendant has also attached to his sentencing memorandum various

certificates of appreciation from members of the military or his former employers.

The Court should give these little or no weight because they were all created in

2003 or 2004, at a time when the defendant had successfully hidden his

relationship with the IIS and it was unknown that the defendant had lied on his

security clearance application forms.  In fact, Agent Rankin located the authors of

two of the letters, Steven Jordan and James Crawford.  Both men told Agent

Rankin that they would not have written the letters had they known about the

defendant's lies on his security clearance forms or his conviction for false

statements.  *See* Exhibit E, 302s of Steven Jordan and James Crawford.

The defendant's claim that he served in Iraq for altruistic reasons is

undermined by the fact that the defendant had a significant financial incentive to

work in Iraq.  According to the Presentence Report, the defendant was earning

$12.50 per hour at a Chrysler assembly plant before going to Iraq as a translator

with the U.S. military.  PSR at ¶ 63.  This wage was comparable to the defendant's

25

earnings in previous years.  *Id.* at ¶ 64-68.   While a translator in Iraq, the

defendant's salary increased dramatically to $186,000 per year.  *Id.* at ¶ 62.   In

addition, Agent Rankin testified at trial that the defendant admitted to receiving

approximately $15,000 in profit on an investment that the defendant made in a rug

company in Iraq while he was serving with the U.S. military.  *See* Transcript of

Trial Testimony of FBI Special Agent Thomas Rankin, January 10, 2011, at 31-38.

Financial records introduced at trial confirmed that the defendant received the

money.  *Id.*

In summary, the Court should give little or no weight to the defendant's

work in Iraq.  The defendant obtained his position in Iraq through fraud and deceit.

It was motivated by financial gain, not patriotism.  And the accolades he received

from members of the U.S. military are all suspect because they are either based on

less than full knowledge of the defendant's true character and activities, or are

contradicted by the experiences of other members of the military.  The Court

should not reduce the defendant's sentence because of his work in Iraq.

D.      The Need to Avoid Disparate Sentences

Lastly, the sentence recommended by the government should be imposed so

as to avoid unwarranted sentencing disparities with similarly situated defendants.

This Court has had two prior cases in which the defendants were convicted of

26

charges stemming from their activities as agents of the IIS.  In *United States v. Shemami*, Case No. 07-20160, the defendant pleaded guilty and was sentenced to 46 months' imprisonment.  *See* Docket No. 53, Judgment.  In *United States v. Al-Awadi*, Case No. 07-20314, the defendant pleaded guilty and was sentenced to 18 months' imprisonment.  *See* Docket No. 24, Judgement.   The major distinction between the two defendants was that, at the time of sentencing, Al-Awadi was 78 years old and "suffered from a multitude of major medical maladies."  Docket No. 21, Def. Sent. Memo, at 7.  At the time of his sentencing, Shemami did not suffer from any major medical problems and was considerably younger.[4]

In the present case, the defendant did not plead guilty.  He proceeded to trial and committed perjury during the trial.  The defendant is therefore not deserving of the same types of punishment given to defendant Shemami and Al-Awadi – he is not deserving of the decreased punishment they received to reflect their acceptance of responsibility.  In fact, the defendant's sentencing memorandum shows that he continues to refuse to accept responsibility for his crimes, and continues to tell this

---

[4]  The Court's sentences in *Shemami* and *Al-Awadi* are also roughly consistent with sentences from other courts in cases involving foreign agents.  *United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010) (48 months' imprisonment); *United States v. Shaaban*, 252 Fed.Appx. 744, 746 (7th Cir. 2007) (160 months' imprisonment); *United States v. Dumeisi*, 424 F.3d 566, 574 (7th Cir. 2005) (46 months' imprisonment).  The point of mentioning these cases is not to suggest that defendant Hamama is exactly like defendant Shemami, Al-Awadi, Duran, Shaaban, or Dumeisi.  Rather, the point is that lengthy prison sentences have been imposed and are appropriate in these types of cases.

Court the same lies that the jury rejected.  He claims, for example, that he was an unknowing agent of the IIS whose contacts with the Iraqi government were merely to facilitate "the delivery of medicines and toys . . . for Iraqi children and civilians," and that his "good intentions were manipulated" by the IIS.  Def. Sent. Memo. at 3-4.  Given the defendant's numerous and ongoing lies, the government believes that a sentence significantly above defendant Shemami's sentence is appropriate.

<u>CONCLUSION</u>

For the foregoing reasons, the government requests that the Court impose a sentence of 78 months in this case.

Respectfully submitted,

BARBARA L. MCQUADE
United States Attorney

<u>s/Michael C. Martin          </u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9670
E-mail: Michael.C.Martin@usdoj.gov

<u>s/Cathleen M. Corken          </u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-0206
E-mail: Cathleen.Corken@usdoj.gov

Dated: August 15, 2011

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2011, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to Mr. Haytham Faraj, counsel for the defendant.


<u>s/Michael C. Martin</u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone: (313) 226-9670
E-mail: Michael.C.Martin@usdoj.gov

30